Sealed

**FILED UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

FILED by _____ D.C.

JUN 0 9 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

| | |
|---|---|
| **PLAINTIFFS UNDER SEAL**<br><br>v.<br><br>**DEFENDANTS UNDER SEAL** | **16-80948**<br>Civil Action No. _____ **CIV-ZLOCH**<br><br>**FILED UNDER SEAL**<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA; and the
STATES OF FLORIDA, IOWA, ILLINOIS
AND MINNESOTA,

*ex rel.* Sheila Mangrum,

Plaintiffs,

v.

LIFESPACE COMMUNITIES, INC.,
INDIVIDUALLY, including its licensees,
affiliates, subsidiaries and businesses THE
WATERFORD, ABBEY DELRAY,
ABBEY DELRAY SOUTH, HARBOUR'S
EDGE, VILLAGE ON THE GREEN,
BEACON HILL, OAK TRACE, THE
DEERFIELD, FRIENDSHIP VILLAGE OF
BLOOMINGTON, GRAND LODGE AT
THE PRESERVE, and FRIENDSHIP
VILLAGE OF SOUTH HILLS,
REHABCARE REHABILITATION
SERVICES, INC.,  THE POLARIS
GROUP, and JOHN DOES 1-50

Defendants.

Civil Action No. _____

**16-80948**

**CIV-ZLOCH**

**FILED UNDER SEAL**

**COMPLAINT FOR VIOLATIONS OF
THE FEDERAL and STATES' FALSE
CLAIMS ACTS**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I.      INTRODUCTION………………………………………………………………1

II.     JURISDICTION AND VENUE ……………………………………………… 5

III.    PARTIES ………………………………………………………………………… 5
   A.   PLAINTIFF/RELATOR SHEILA MANGRUM ……………………………………… 5
   B.   DEFENDANTS ………………………………………………………………………… 6
      1.   Lifespace Communities, Inc. …………………………………………………… 6
      2.   RehabCare Rehabilitation Services …………………………………………… 7
      3.   The Polaris Group …………………………………………………………………… 7
      4.   John Does #1-50 Fictitious Names …………………………………………… 8

IV.     REGULATORY BACKGROUND……………………………………………… 8
   A.   THE MEDICARE PROGRAM ……………………………………………………… 8
      1.   Medicare Part A …………………………………………………………………… 10
      2.   Medicare Part B …………………………………………………………………… 11
      3.   Medicare Reimbursement and SNFs………………………………………… 11
         (i)    Setting Payment Rates (using RUGs) …………………………… 12
         (ii)   Medicare Overpayments to Facilities ………………………… 18
         (iii)  Medicare Coverage for Reasonable and Necessary Services …………… 18
         (iv)   Cost Reports …………………………………………………………… 19
   B.   MEDICAID ………………………………………………………………………… 20

V.      DEFENDANTS' FRAUDULENT SCHEMES………………………………… 22

VI.     DEFENDANTS CONSPIRED TO DEFRAUD GOVERNMENT PROGRAMS……… 32

VII.    DEFENDANTS KNOWINGLY VIOLATED THE FALSE CLAIMS ACT AND
        FALSELY CERTIFIED COMPLIANCE WITH FEDERAL REGULATIONS ………… 33

VIII    DEFENDANTS UNLAWFULLY RETALIATED AGAINST RELATOR ………… 35
        COUNT I (VIOLATION FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(A): PRESENTING
            OR CAUSING TO BE PRESENTED FALSE CLAIMS) ……………………………… 37
        COUNT II (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B): FALSE RECORDS
            OR STATEMENTS) …………………………………………………………………… 38
        COUNT III (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(G): REVERSE FALSE
            CLAIM) …………………………………………………………………………… 38
        COUNT IV (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(C): CONSPIRACY) … 39
        COUNT V (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(H): UNLAWFUL
            TERMINATION)…………………………………………………………………… 39
        COUNT VI (VIOLATION OF FLORIDA FALSE CLAIMS ACT)………………………… 39
        COUNT VII (VIOLATION OF IOWA FALSE CLAIMS ACT) …………………………… 41
        COUNT VIII (VIOLATION OF ILLINOIS FALSE CLAIMS ACT)……………………… 42
        COUNT IX (VIOLATION OF MINNESOTA FALSE CLAIMS ACT) ……………………… 43

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 ET SEQ.

This is an action brought on behalf of the United States of America and the *Qui Tam* States by Plaintiff-Relator Sheila Mangrum ("Relator"), by and through her attorneys, against Defendants pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* and pursuant to the *qui tam* provisions of the following States: the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* (2000); the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 *et seq.* (2000); the Iowa False Claims Act, Iowa Code § 685.1 *et seq.* (2010); and the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.* (2011) (the "State *qui tam* statutes" or "*Qui Tam* States").

## I.     INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States, arising from false statements and claims that Defendants knowingly presented to, or caused to be presented to, the United States and the *Qui Tam* States.

2.      From at least 2009 to the present, the fraudulent acts, submission of false claims and creation of false records as described in this complaint were committed by **Lifespace Communities, Inc.,** its licensees, affiliates, subsidiaries and business located in seven states, including **The Waterford** (601 Universe Blvd., Juno Beach, FL 33408); **Abbey Delray** (2000 Lowson Blvd., Delray Beach, FL 33445); **Abbey Delray South** (1717 Homewood Blvd., Delray Beach, FL 33445); **Harbour's Edge** (401 E Linton Blvd., Delray Beach, FL 33483); **Village on the Green** (500 Village Place, Longwood, FL 32779); **Beacon Hill** (2400 S. Finley Road, Lombard, IL 60148); **Oak Trace** (200 Village Dr., Downers Grove, IL 60516); **The Deerfield** (13731 Hickman Rd., Urbandale, IA 50323) **Claridge Court** (8101 Mission Rd., Prairie Village, KS 66208); **Friendship Village of Bloomington** (8100 Highwood Dr.,

Bloomington, MN 55438); **Grand Lodge at the Preserve** (4400 S 80th St., Lincoln, NE 68516); **Friendship Village of South Hills** (1290 Boyce Rd., Upper St Clair, PA 15241) (collectively "Lifespace").

3. Lifespace Communities, Inc. ("Lifespace") planned and directed its nationwide fraudulent schemes to maximize revenue at all twelve of its skilled nursing facilities, which at any one time contained 800 patient beds -- patients who received government-funded health insurance, including Medicare and Medicaid (collectively "Government Programs").

4. Lifespace's scheme was primarily centered around fraudulently billing Medicare and Medicaid at unsupported "Ultra-High RUG" and "Very-High RUG" levels in order to fraudulently obtain higher payments. In other words, Defendants upcoded the Resource Utilization Group ("RUG") level assigned to its nursing home residents in order to receive inflated payments for services, especially including rehabilitation services, that were not reasonable and necessary for the residents. Defendants orchestrated this scheme by, among other things, implementing business strategies that emphasized setting aggressive Ultra High billing targets, knowing that they were unrelated to patients' actual conditions, diagnoses, or needs.

5. Lifespace then reinforced those targets via a host of methods, including through discussions at corporate meetings and presentations, regular emails from or visits by corporate personnel, employee performance evaluations, by imposing action plans on underperforming facilities, and various other means.

6. Lifespace also pressured its employees in a number of ways to maximize the number of days and reimbursement levels Defendants' facilities billed to Medicare and Medicaid at Ultra High levels, by among other things manipulating Minimum Data Set ("MDS") records.

7.     To facilitate Lifespace's corporate pressure to maximize its Ultra High billings, Lifespace entered into an agreement or understanding with Defendant Rehabcare to provide Medicare and Medicaid beneficiaries with excessive amounts of therapy that were not medically reasonable and necessary.   Defendant Rehabcare cooperated in the scheme by providing unnecessary rehabilitation services to Lifespace residents, by documenting the residents' continued need for the services, and by documenting the residents' satisfactory therapeutic progress – which was necessary for the resident to continue qualifying for Medicare's SNF benefits.   Rehabcare was incentivized to fraudulently inflate RUG levels by Lifespace's agreement to compensate Rehabcare a percent of therapy revenues received.

8.     According to defendant The Polaris Group's internal Lifespace Medicare Utilization Report, for the time period April 1, 2014 through June 30, 2014 The Waterford's RUG Distribution was over 92% for the combined Ultra-High and Very-High RUG values (67.74% and 24.77%, respectively).   These values were not accurate, and the inflated levels have been and are consistent with Lifespace's corporate policies to maximize revenue.

9.     In addition, to ensure its 800 Skilled Nursing Facility ("SNF") beds were always full, Lifespace took advantage of regulations that required it to have a "Medical Director." A Medical Director is usually a licensed physician with oversight responsibility for the healthcare facility. More often than not, the Medical Director is a physician with his or her own private practice who agrees to serve on a part-time basis as Medical Director in exchange for a fee.  For most healthcare facilities, like Lifespace, the lifeblood of revenue consists of referrals from physicians. This creates a powerful incentive for healthcare facilities to offer kickbacks to physicians in exchange for referrals. For this reason, the federal healthcare laws, including the Stark Law and the Anti-Kickback Statute, have set up a variety of prohibitions to make sure that

physicians make referrals based on the best interests of the patient, rather than the best interests of their own pocketbooks.

10.     *Bona fide* Medical Directors perform a valuable function at a hospital or a nursing facility, but the position can also be a cover for doctors to steer their patients to a particular facility.  Thus, Lifespace sought to circumvent the Stark Law and the Anti-Kickback Statute by hiding kickbacks in the form of sham Medical Director agreements.

11.     According to an internal 2015 Budget prepared for The Waterford, for the month ending November 30, 2014, The Waterford paid its Medical Director(s) $2,500, with year-to-date payments of $33,020.   These payments by Lifespace were knowingly were made for referrals of Medicare patients.

12.     Although Relator complained about the manipulation of MDS and other regulatory violations, Defendants largely ignored those complaints, and instead, began a series of retaliatory acts aimed at Relator.

13.     Defendants' corporate strategy and pressure succeeded in significantly increasing the number of days it billed at the Ultra High level and therefore inflating the money it received from Medicare and Medicaid.

14.     Because Defendants knowingly submitted false claims to the Medicare and Medicaid programs for medically unreasonable, unnecessary and unskilled therapy services, and used false records and statements to support those false claims, Relator brings this action on behalf of the United States and the *Qui Tam* States to recover treble damages and civil penalties under the federal False Claims Act, 31 U.S.C.  §§ 3729-33 ("FCA") and the State *Qui Tam* statutes.

## II.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

16.    This Court has personal jurisdiction over the Defendants because, among other things, Defendants transact business in this District and engaged and continue to engage in wrongdoing in this District.

17.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).  Defendants transact business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

18.    The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendants to conceal from the United States, patients and the general public their wrongdoing in connection with the allegations made herein.

19.    Defendants' conduct had a material effect on government-funded health plans' decisions to pay for skilled therapy services performed by Defendants.  Had the United States known that Defendants misrepresented the schemes described herein, government-funded health plans would not have paid or made reimbursements for care at falsely inflated RUG levels and/or for the related skilled therapy services.

20.    Defendants' fraudulent scheme is ongoing.

## III.    PARTIES

### A.    Plaintiff/Relator Sheila Mangrum

21.    Relator Sheila Mangrum ("Relator"), Director of Nursing at The Waterford, a Lifespace Communities facility, brings this action on behalf of the United States of America. Relator Mangrum is a resident of Florida. She began working at The Waterford, one of

Lifespace's 12 skilled nursing facilities, in July 2014 and is currently employed there as of the filing of this complaint.

22.     Relator Mangrum is the original source of the allegations in this Complaint. The essential elements of her allegations are not based upon publicly disclosed information. Relator Mangrum voluntarily provided the Government with the information supporting her claims prior to the filing of this Complaint in accordance with 31 U.S.C. § 3730(b)(2). Accordingly, Relator Mangrum is an "original source" of the information alleged in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).

### B.     Defendants

#### 1.     Lifespace Communities, Inc.

23.     Lifespace Communities, Inc. ("Lifespace") is an Iowa non-profit organization that operates 12 senior living centers that include separate operations for skilled nursing and rehabilitative facilities consisting of some 800 beds.

24.     Lifespace operates in 7 states including Florida, Iowa, Pennsylvania, Illinois, Nebraska, Kansas and Minnesota. Five of its facilities are located in Florida: Abbey Delray, Abbey Delray South, Harbour's Edge, The Waterford, and Village on the Green. According to its IRS 990 filing, Lifespace's annual revenue amounted to over $200 million in 2012 and its assets, including investment income, exceeded $600 million. Lifespace's corporate headquarters is at: 100 East Grand Avenue, Suite 200, Des Moines, Iowa 50309.

25.     The Waterford ("Waterford") is a Lifespace facility located at 601 Universe Boulevard, Juno Beach, Florida 33408. The Waterford is a 60 bed facility where all beds are dually certified to take both Medicare and non-Medicare patients. The facility includes both a residential portion and a health center that provides nursing and therapy services to both residents and non-residents.  Based on internal corporate emails concerning The Waterford's

Medicare revenue, in 2012 the Waterford received $1,563,661 from Part A, and $264,207 from Part B; and in 2013 received $1,423,837 for Part A and $260,471 from Part B.

26.    Lifespace's other facilities are similarly situated, operate under the direction and control of Lifespace, and have submitted false claims to Medicare and Medicaid.

### 2.    RehabCare Rehabilitation Services

27.    Defendant RehabCare Rehabilitation Services ("RehabCare") is a provider of physical, occupation and speech-language rehabilitation services. RehabCare provides contract rehabilitation therapy services to patients in skilled nursing facilities (SNFs), hospitals, and outpatient clinics, and is a wholly-owned subsidiary of Kindred, a healthcare services company that provides a continuum of post-acute care services in a variety of care settings. RehabCare is the largest provider of therapy in the nation, contracting with more than 1,000 SNFs in 44 states to provide rehabilitation therapy to their patients.

28.    RehabCare provides contract therapy services at The Waterford and other Lifespace facilities.

29.    Lifespace outsources all therapy to RehabCare, and RehabCare employees facilitated the Ultra High RUG rates for patients receiving therapy in Lifespace facilities. RehabCare's corporate headquarters are located at 680 South Fourth Street, Louisville, KY 40202.

### 3.    The Polaris Group

30.    The Polaris Group ("Polaris") is a Medicare and Medicaid consulting group, located at 3030 N. Rocky Point Drive, Suite 240, Tampa, FL 33607.  Polaris has provided Lifespace, including at The Waterford, with business consulting services at all relevant times. Relator believes and therefore alleges that Polaris knew about, and facilitated the billing and record falsification claims made in this complaint.

Filed Under Seal

31.     Polaris Group touts its expertise in a number of areas, and boasts that it has helped to enhance care and improve efficiencies since 1988. "For over 20 years, we [Polaris] have provided post-acute health care providers like you with clinical, operational, and financial solutions to the challenges presented by the long-term-care market. Navigating the ever-changing rules, structures, and procedures of today's healthcare environment, Polaris Group specialists and consultants have become industry-leading experts trained to help you manage your facility's costs, improve reimbursement accuracy, and identify opportunities for efficiency company-wide."

### 4.     John Does #1-50 Fictitious Names

32.     Defendants John Does #1-50, fictitious names, are individuals, corporations, limited liability companies, or other lawful business entities who, through Lifespace, do business in the United States, and who are unknown co-conspirators who conspired with Defendants to perpetuate the fraudulent scheme as described herein.  To the extent that any of the conduct or activities described in this Complaint were not performed by Defendant Lifespace, but by the individuals described herein as John Does #1-50, fictitious names, any reference herein to Lifespace under such circumstances, and only under such circumstances, refers also to John Does #1-50 and/or other co-conspirators who conspired with Defendant to perpetrate the schemes described herein.

## IV.     REGULATORY BACKGROUND

### A.     The Medicare Program

33.     The Medicare Program ("Medicare") is the federal health insurance program for the aged and disabled established by Congress in 1965 as Title XVIII of the Social Security Act and codified at 42 U.S.C. § 1395, *et seq.*  Medicare is administered through the Centers for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration

("HCFA").  CMS is a division of the United States Department of Health and Human Services ("HHS").  Defendants were and are approved providers and/or suppliers under the Medicare Program.

34.     Medicare reimburses health care providers for specified health care services furnished to certain population groups, including the disabled and persons over age 65.  Persons eligible for Medicare reimbursed services are referred to as "beneficiaries."  Currently, Medicare provides insurance coverage for over 40 million Americans, including many who require skilled therapy services.

35.     The Medicare Program is divided into four parts: (a) Part A provides coverage for in-hospital care and, relevant here, also covers a limited number of days of skilled nursing services at a Skilled Nursing Facility ("SNF"), including therapy services; (b) Part B covers durable medical equipment and supplies, and the services of medical professionals -- i.e. the physicians' services, which is defined to include "outpatient" rehabilitation services for nursing home residents who have exhausted their Part A SNF benefits [*see Rehabilitation Ass'n of Virginia, Inc. v. Kozlowski*, 42 F.3d 1444, 1162 (4th Cir. 1994) (citing 42 § 1395w-4(j) (defining physicians' services) and 42 § 1395x(p) (defining "Outpatient physical therapy services"))]; (c) Part C, or "Medicare + Choice," is provided through private insurers who bundle traditional Medicare coverage under Parts A, B and D, and also offer supplemental coverage; and (d) Part D, which provides coverage for outpatient drugs.  *See generally* 42 U.S.C. §§ 1395 through 1395i-5 (Part A – Hospital Insurance Benefits for the Aged and Disabled); 42 U.S.C. §§ 1395j through 1395w-4 (Part B – Supplemental Medical Insurance Benefits for the Aged and Disabled); 42 U.S.C. § 1395w-21 (Medicare + Choice Plan); 42 U.S.C. § 1395w-101 *et seq.*.

### 1.    Medicare Part A

36.     Medicare Part A is so called because the governing law is found in Part A of Title XVIII of the Social Security Act.  Some of the services that are covered under Part A include, without limitation: (a) part-time or intermittent skilled nursing care and home health aid services; (b) physical, speech and occupational therapy; (c) medical equipment and supplies; and (d) social services.  *See generally* 42 U.S.C. §§ 1395 through 1395i-5 (Part A – Hospital Insurance Benefits for the Aged and Disabled); *see* 42 U.S.C. § 1395i-3 ("Requirements for, and assuring quality of care in, skilled nursing facilities") and § 1395i-3a ("Protecting residents of long-term care facilities").

37.     In order to receive coverage under Part A for SNF care, beneficiaries must continue to meet regular eligibility requirements.  That is, a beneficiary must have been an inpatient of a hospital for a medically necessary stay of at least three (3) consecutive calendar days.  In addition, within thirty (30) days after discharge from a hospital, the beneficiary must have been transferred to a SNF that signed a participating agreement with CMS.  Further, the beneficiary must require daily skilled nursing or rehabilitation services.  42 U.S.C. § 1395x(i) (defining covered "post-hospital extended care services"); HCFA Skilled Nursing Facility Manual, Chapter 2 – Coverage of Services, § 212, *et seq.*

38.     Medicare requires that a physician or other health care provider certify that the conditions affording coverage are met at the time of the patient's admission to the nursing facility or rehab program and to recertify the patient's continued need for skilled therapy services at regular intervals.  To be considered a "skilled service," it must be so "inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical, occupational or speech therapists. 42 C.F.R. § 409.31(a).

39.     Skilled rehabilitation therapy does not generally include personal care services or assistance with acts of daily living, or other general exercises or range of motion treatments that can be administered by non-skilled staff, including exercises to improve gait, maintain strength or provide assistance with ambulation.  *See* 42 C.F.R. § 409.33(d); *see also* Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1

40.     If a beneficiary meets these eligibility requirements, then Medicare provides one hundred (100) days of Part A SNF coverage per benefit period.  42 U.S.C. § 1395a(a)(2).

### 2.     Medicare Part B

41.     Medicare Part B provides supplemental medical insurance and only provides for payment of those services that are medically necessary.  *See* 42 C.F.R. § 410.3 (Scope of Benefits).

42.     Part B is a voluntary program financed in part through premiums paid by the participants.  Each Part B participant must pay a basic monthly premium as well as any deductible or co-insurance amount.  *See* CMS Carrier Manual, Part 3, Chapter I – Entitlement and Enrollment, § 208.

43.     Part B is also funded by the Federal Government.  There are two ways that the government makes payment under Part B of the Medicare Program: (1) directly to the physician or facility – the assignment method or (2) directly to the patient who is obligated to reimburse the physician or facility.  *See* CMS Carrier, Manual, Part 3, Chapter III – Claims Filing Jurisdiction and Development Procedures.

### 3.     Medicare Reimbursement and SNFs

44.     Section 4432(a) of the Balanced Budget Act ("BBA") of 1997 modified how payment was made by the government for skilled care services.  Effective with cost reporting periods beginning on or after July 1, 1998, SNFs transitioned to the Prospective Payment System

("PPS").  Under the PPS, SNFs receive a fixed *per diem* rate for all Part A post-hospital extended care services.  As such, SNFs could no longer bill the government based on reasonable costs or through low volume, but rather based on prospectively determined rates for covered Part A SNF services provided to patients.

(i)    Setting Payment Rates (using RUGs)

45.    The initial payment rates to SNFs and rehabilitation providers (often also referred to as "rehabilitation agencies") were set in 1998 and reflected the projected amount that SNFs received in 1995, adjusted for inflation.  The base payment rates were computed separately for urban and rural areas and were updated annually based on the projected increase in the SNF market basket index, a measure of the national average price level for the goods and services SNFs purchase to provide care.

46.    Daily payments to SNFs are determined by adjusting the base payment rates for geographic differences in labor costs and case mix.  To adjust for labor cost differences, the labor-related portion of the total daily rate—seventy-six percent (76%) for fiscal year 2007—is multiplied by the hospital wage index in the SNF's location and the result is added to the non-labor portion.

47.    Medicare requires nursing facilities periodically to assess each patient's clinical condition, functional status, and expected and actual use of services, and to report the results of those assessments using a standardized tool known as the Minimum Data Set ("MDS").  The MDS is used as the basis for determining a patient's RUG level and, therefore, the daily rate that Medicare will pay a nursing facility to provide skilled nursing and therapy to that patient.

48.    In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the facility. The date the facility performs the assessment is known as the assessment reference date.  A

nursing facility may perform the assessment within a window of time before this date, or, under certain circumstances, up to five days after. When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the assessment reference date. As discussed above, this seven-day assessment period is referred to as the "look-back period."

49.     The MDS collects clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status. Section P of the MDS ("Special Treatments and Procedures") collects information on how much and what kind of skilled rehabilitation therapy the facility provided to a patient during the look-back period. In particular, Section P shows how many days and minutes of therapy a nursing facility provided to a patient in each therapy discipline (i.e., physical therapy, occupational therapy, and speech-language pathology and audiology services). As discussed below, the information contained in Section P directly impacts the rehabilitation RUG level to which a patient will be assigned.

50.     Prior to October 1, 2010, the nursing facility would electronically transmit the MDS form to a state's health department or other appropriate agency, which in turn would transmit the data to CMS. 42 C.F.R. § 483.20(f)(3) (2008); 42 C.F.R. § 483.315(h)(1)(v) (2008). Since October 1, 2010, nursing facilities transmit the data directly to CMS. 42 C.F.R. § 483.20(f)(3).

51.     CMS makes use of each patient's RUG classification to determine Medicare's *per diem* reimbursement payment to the SNF. The daily base rates are adjusted for case mix. Each RUG has associated nursing and therapy weights that are applied to the base payment rates.

These weights were developed using time study data from 1990, 1995 and 1997. These weights have been updated since the implementation of PPS.

52.    The fifty-three (53) group RUG classification system went into effect January 1, 2006, replacing the forty-four (44) group RUG system. The 53-group system added nine new payment groups for patients who meet the criteria for "extensive services" and "rehabilitation" groups. Patients are assigned to one of the 53 RUGs based on patient characteristics and service use that are expected to require similar resources.

53.    Assigning a Medicare beneficiary to one of the RUGs is based on the number of therapy minutes (physical, occupational, or speech) that the patient has used or is expected to use; the need for certain services (e.g., respiratory therapy or specialized feeding); the presence of certain conditions (e.g., pneumonia or dehydration); an index based on the patient's ability to perform independently four activities of daily living (e.g., eating, toileting, bed mobility and transferring); and in some cases, signs of depression. Patients' characteristics and service use are determined by periodic assessments using the MDS. The highest daily rate Medicare will pay a nursing facility is reserved for those beneficiaries that require "Ultra High" levels of skilled therapy, or a minimum of 720 minutes per week of skilled therapy from at least two therapy disciplines.

54.    There are five basic RUG classifications delineated by the amount of time a patient is required to be in therapy in order to achieve the expected therapeutic result. The classifications are: Ultra High (over 720 minutes), Very High (500-719 minutes), High (325-499 minutes), Medium (150-324 minutes) and Low (45-149 minutes). The Ultra High level is intended for the most clinically complex patients who require skilled therapy services well beyond the average patient.

55.   CMS made various changes to the RUG-III structure through its RUG IV classification system, which took effect October 1, 2010.  CMS initiated a national project to create an updated MDS (Version 3.0) to improve the clinical relevance and accuracy of MDS assessments.  CMS added new clinical RUG categories, modified the time frame in which each assessment must be performed, required that facilities assess changes in the level of therapy every seven days and revised certain rules for group therapy, among other changes.  74 Fed. Reg. 40,288 (August 11, 2009).  Under the revised regulations, CMS changed the rules for concurrent therapy by apportioning payment among patients treated concurrently and by counting as "treatment" minutes only the apportioned therapist time rather than the actual number of therapy minutes provided to patients.  By apportioning minutes and not counting the actual number of therapy minutes administered to a patient in concurrent sessions, patients should be assigned to lower RUG categories with lower payment levels.  Further, facilities must complete a "change of therapy" assessment when the amount of therapy provided no longer reflects the RUG and an "end of therapy" assessment must be completed when therapy has been discontinued for three consecutive days.

56.   The structure of the RUG groups and the daily PPS rate is adjusted periodically.  The RUG-III classification was in place from January 1, 2006 through October 1, 2010.  The RUG-IV classification system has been in effect from October 1, 210 through the present.  70 Fed. Reg. 45026-01.

57.   There are seven RUG-III categories:  rehabilitation, extensive services, special services, clinically complex, impaired cognition, behavior and physical.  63 Fed. Reg. 26252-01.  The rehabilitation category is divided into five sublevels determined by the amount of time a patient is required to be in therapy in order to achieve the expected therapeutic result.  Ultra High

or Rehab Ultra, requires 720 minutes of therapy per week, with two out of three therapy disciplines and one discipline providing services 5 days a week,  Rehab Very High requires 500 or more minutes of treatment per week and one discipline providing services 5 days  a week or more, Rehab High requires 325 minutes or more of treatment a week with one discipline providing services 5 days a week or more, Rehab Medium requires 150 minutes of treatment from any of the 3 disciplines at least 3 days a week and Rehab Low requires 45 minutes of treatment a week from any of the 3 disciplines for at least 3 days of the week.  The Ultra High level is intended for the most clinically complex patients who require skilled therapy services well beyond the average patient.  *Id.*

58.     RUG levels also consider a patient's capacity to perform activities of daily living ("ADL") such as toileting, eating, transfers and mobility.  ADL scores are broken into 5 different scores based on a person's capabilities ranging from categories A, B and C, which involve rehabilitation that do not involve extensive services, to categories L and X, which involve extensive services.  Using this scoring, the patient in need of the lowest level of services would score an A, while the patient in need of the most extensive services would score an X.  74 Fed. Reg. 40288-01.

59.     The MDS form is required to be completed and submitted to the Government for all nursing home residents, including by Defendant, who receive reimbursement from Medicare or Medicaid.  42 C.F.R. § 483.315.  SNFs use the MDS to assess each beneficiary's clinical condition, functional status, expected and actual use of services.  In the MDS, a health care provider must provide the Government with an accurate and comprehensive assessment of each resident's functional capabilities, identify health care problems and formulate a resident's individual plan of care.  MDS assessments are required to be completed by nursing homes for all

residents and generally such forms are completed within 5 days of admission, 14 days thereafter and then at 30, 60 and 90 day intervals.

60.   MDS assessments are signed by the individuals who complete all or a portion of the MDS form and contain the following certification:

> I certify that the accompanying information accurately reflects resident assessment or tracking information for this resident and that I collected or coordinated collection of this information on the dates specified.  To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements.  I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds.  I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information and that I may be personally subject to and may subject my organization to substantial criminal, civil and/or administrative penalties for submitting false information.  I also certify that I am authorized to submit this information by this facility or on its behalf.

61.   MDS assessments are transmitted electronically by nursing homes to the MDS database in their respective states, which information is then captured into a national MDS data base at CMS.

62.   Specifically, a patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code, which Medicare uses to determine the payment amount owed to the nursing facility.  The HIPPS code must be included in the CMS-1450, which nursing facilities submit electronically to Medicare for payment.  Medicare Claims Processing Manual, Ch. 25, § 75.5.  Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450.  *See* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5

63.     Skilled nursing facilities submit the CMS-1450 electronically under Medicare Part A to Medicare payment processors, known as Medicare Administrative Contractors ("MACs"), formerly known as Fiscal Intermediaries ("FIs").  MACs process and pay Medicare claims.

(ii)     <u>Medicare Overpayments to Facilities</u>

64.     Providers may not submit claims for services that are "of a quality which fails to meet professionally recognized standards of health care."  42 U.S.C. § 1320c-5(a)(2)(providers may not submit claims for inadequate care); 42 U.S.C. § 1320a-7b(a)(1) and (3) (criminal penalties for submitting false claims when a provider knows it has no continued right to receive payment).  Clinical practice requirements dictate that SNFs accurately document the number of therapy minutes provided to each beneficiary.  CMS RAI Manual 2.0, § 1.14.  In addition, providers must document in the medical record the care each beneficiary needs and receives, as well has how he or she responded to that therapy.  *Id.*

65.     When an incorrect overpayment is made to a SNF or rehabilitation agency, they are liable for the overpayment unless the intermediary determines that it was without fault.

66.     Under the following situations, providers are liable for any overpayment:  (a) when a SNF furnished erroneous information or failed to disclose facts it knew or should have known were relevant to payment of a benefit; (b) the overpayment was due to a mathematical or clerical error, e.g., an error in calculation by the SNF, or overlapping or duplicate bills; (c) documentation was not submitted to substantiate that the services billed to Medicare were actually performed; or (d) Medicare paid for services not covered under the program and the SNF should have known the services were not covered (e.g., medically unnecessary services).

(iii)     <u>Medicare Coverage for Reasonable and Necessary Services</u>

Filed Under Seal

67.     Coverage of health care services under Medicare is subject to the requirement that the services provided are reasonable and necessary for the treatment of an illness or injury or to improve the functioning of a malformed body part. Health care services that fail to meet this requirement will not be reimbursed by the Government. *See* 42 U.S.C. § 1862 (a)(1)(A).

68.     A specific health care service is *necessary* when it can be expected to make a meaningful contribution to the treatment of a patient's illness or injury.

69.     Though the health care service may serve a medically necessary purpose, a rehab agency must also consider to what extent, if any, it would be *reasonable* for the Medicare Program to pay for the item prescribed, taking into account the following considerations:

(a)     Would the expense of the item to the program be clearly disproportionate to the therapeutic benefits that could ordinarily be derived from use of the equipment?

(b)     Is the item substantially more costly than a medically appropriate and realistically feasible alternative pattern of care?

(c)     Does the item serve essentially the same purpose as equipment already available to the beneficiary?

(d)     Whether those same services could be provided as part of routine nursing care, including restorative care or wound care?

(iv)    Cost Reports

70.     All Medicare Part A participating providers are required to file cost reports each year with their fiscal intermediary. The cost report serves as the health care provider's final claim for payment from Medicare for the services rendered to program beneficiaries for the fiscal period in question. The cost report sets forth all of the provider's costs, accounts for the costs

under applicable provisions of the Medicare statue and HHS program instructions, and results in a claim for a total amount of reimbursement for the fiscal year. *See* 42 C.F.R. §§ 413.20, 413.24.

71.    In the cost report, providers must document the costs incurred in furnishing items and services to Medicare beneficiaries, such as costs arising from arrangements with outside suppliers to obtain items and services, including medical equipment and supplies. *See* 42 U.S.C. § 1395g(a); 42 U.S.C. § 413.20(b).

72.    The cost report form requires a rehab agency or related entity providing skilled therapy services to certify that it is "familiar with the laws and regulations regarding the provision of health care services and that the services identified in the cost report were provided in compliance with such law and regulations." *See* 42 U.S.C. § 1395g(a); *see also* 42 C.F.R. § 413.24(f).

73.    Misrepresentation or falsification of any information contained in a cost report is punishable by civil, as well as criminal and administrative action, fine and/or imprisonment under federal law.  Further, if services identified in a cost report were provided or procured through the payment directly or indirectly of an illegal kickback or referral, civil, criminal and administrative action, fine and/or imprisonment may result. *See* 42 U.S.C. § 1395g (a); *see also*, 42 C.F.R. § 413.24(f).

### B.    Medicaid

74.    The Medicaid program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to persons who are low-income, blind, disabled, or members of families with dependent children or qualified pregnant women or children.

75.    Medicaid is managed at the federal level by CMS.  At the state level, within broad federal rules, each state decides eligible groups, types and ranges of services, payment levels for

services, and administrative and operating procedures.  The states directly pay providers using both state and federal funds.  The states obtain the federal share of the payment from accounts which draw on the U.S. Treasury.  42 C.F.R. § 430.0-430.30 (1994).

76.     The specific percentage that the Federal Government reimburses a state is referred to as the Federal Medical Assistance Percentage ("FMAP") and is calculated for each state according to a formula based on per capital income.  Pursuant to the express language of the FCA and its statutory definition of a "claim," Medicaid claims submitted to state Medicaid agencies are considered to be claims presented to the Federal Government, and as such, may give rise to liability under the FTC.  *See United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 2005 U.S. Dist. LEXIS 24032, 2005 WL 2667202 at *3 (N.D. Ill. 2005); *U.S. V. Ortho-McNeil Pharmaceutical, Inc.*, 2007 U.S. Dist. LEXIS 52666, 2007 WL 2091185 at *2 (N.D. Ill. 2007).

77.     Medicaid covers a resident's stay at a nursing facility ("NF"), but does not pay for skilled nursing services.  The regulatory authority implementing the Medicaid program provides reimbursement to health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies.

78.     Medicaid, like Medicare, pays only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury."

79.     Medicaid follows Medicare's PPS and RUGs methodology and assessment schedule, and beneficiaries are assessed using the same MDS form used by Medicare.  Medicaid Reimbursement Manual 6010.58M, Ch. 8, § 2, 4.3.5 – 4.3.7, 4.4.3.

80.     Under the Medicaid for Life program, there are beneficiaries who are enrolled in Medicare and are still eligible for Medicaid ("dual eligible beneficiaries").   For these dual

eligible beneficiaries, Medicaid is the secondary payor to Medicare and is responsible to the skilled nursing facility for any amounts not covered by Medicare. *Id.* at 4.4.

81.     Medicaid prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).   Medicaid considers "[b]illings or CHAMPUS claims which involve flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders" to be fraud. 32 C.F.R. § 199.9(c)(3).   Such practices are deemed abusive and cause financial loss to the United States.   32 C.F.R. §§ 199.9(b).

82.     For Medicaid dual eligible beneficiaries, Medicaid follows Medicare's determination regarding medical necessity.   If services are determined not to be medically necessary under Medicare, they are not covered under Medicaid. Medicaid Reimbursement Manual 6010.58M, Ch. 8, § 2, 4.3.16.

## V.     DEFENDANTS' FRAUDULENT SCHEMES

83.     Lifespace sought to maximize its profits by maximizing the number of residents at its facilities who were Medicare beneficiaries, then upcoding those residents' RUG levels in order to qualify them for the maximum possible rehabilitation services, and then document slow but steady rehabilitative progress in order to maximize the residents' stay at the facilities.

84.     Patient referrals to the Waterford come from the ESIN system covering a network of Southern Florida hospitals. As patients prepare to be discharged from area hospitals, their information is added into the ESIN system, including case history, required care, and insurance information. As new patients appear in the system, staff at the Waterford, including Relator Mangrum, review these potential new patients based on a green, yellow, and red classification

system with green patients being those that require longer term care with more therapy time–a higher potential RUG. If a patient is deemed a good fit for the Waterford then they will accept the patient.

85.     After acceptance through the ESIN system, the patient is transferred from the hospital to the Waterford and admitted. A physical nursing assessment is completed on Day 1 to identify patient needs and gain an understanding of their specific case. The Nursing Coordinator then opens the Assessment Reference Date ("ARD"), which must be completed within the first 8 days of a patient's stay. In order to determine the RUG value for a new patient, the therapy staff conducts an assessment on Day 1.

86.     Staff at the Waterford were instructed to tell hospital discharge planners that the Waterford will take a 'less desirable' patient, one with lower complexity and less therapy needs, only if the planner will also give them a 'better' patient as well. This strategy was intended to maintain a patient pool of more complex patients demanding higher RUG classifications in order to increase Medicare reimbursements.

87.     Because Medicare paid significantly more money for Ultra High beneficiaries than for beneficiaries at lower RUG levels, Lifespace aggressively pushed its facilities and therapists to get as many of its Medicare beneficiaries into the Ultra High RUG level as possible. Lifespace accomplished this by setting and enforcing aggressive targets for the percentage of Medicare rehabilitation days its facilities had to bill at the Ultra High RUG level, with little regard to the individualized needs of its Medicare patients.  Lifespace enforced these Ultra High targets at every level of its corporate hierarchy.

88.     "Average length of stay" refers to the average number of days that a facility's beneficiaries stayed at the facility and, as described above, Medicare pays nursing facilities, per

patient, per day. Lifespace is increasingly adopting a 'head in a bed' strategy, whereby the most important thing is to have a patient in as many beds as possible when the census is completed at midnight each day. In order to maintain a higher census, Lifespace facilities will often keep patients longer than needed. Additionally, Lifespace is known to reject HMO patients more regularly than patients with other types of insurance based upon cost concerns. Administrators will find reasons to reject these patients other than 'cost concerns', with preferred reasons being no free bed, that they don't take their specific insurance, and that they can't provide the required care based on the patient history. Lifespace doesn't have any contracts with HMOs so they can always use the 'don't take their specific insurance' excuse in order to reject HMO patients who could prove less lucrative financially than Medicare or private payer patients. Lifespace will occasionally take certain patients who have HMOs, but only if they know the patient.

89.     The targeted payer for Lifespace is Medicare due to the lower risk of nonpayment. The first 20 days of any qualifying stay are covered 100% by Medicare, with 80% coverage after that until Day 100.

90.     Lifespace pressured its facilities and employees to extend their Medicare beneficiaries' stays in Lifespace facilities to maximize Medicare revenue. This practice ignored patient needs and sometimes resulted in beneficiaries unnecessarily exhausting all 100 days of their Medicare SNF benefit (leaving the beneficiaries with no Medicare Part A coverage for at least 60 days if the beneficiaries later actually needed skilled nursing or rehabilitation care).

91.     Even after the resident exhausted their Medicare Part A benefits, if the resident was also eligible under Medicaid, then the resident's stay at the facility would be covered by Medicaid (although paid at the lower Medicaid flat rate *per diem* for unskilled nursing care) and

the rehabilitation services would be covered by Medicare Part B.  In such a situation, Medicaid would also pay the resident's co-payment obligation under Medicare Part B.

92.     Lifespace continually pressured employees to backdate and/or alter patient reports in order to qualify for higher and/or unnecessary reimbursements from Medicare and/or Medicaid.

93.     Therapy reports would be altered to provide evidence of a gradual improvement in order to support a continuation of therapy and eliminate evidence of a 'therapy plateau.' Medicare provisions require that a patient who receives therapy for a period of three days without any improvement be discharged from therapy. Altering patient records to cover-up a therapy plateau thus enabled Lifespace to continue billing Medicare for services provided. Without these alterations Medicare would not have reimbursed Lifespace for the additional therapy provided to these patients.

94.     Lifespace also encouraged employees to alter MDS reports in order to receive the highest possible reimbursement from Medicare for services provided.

95.     The MDS Report is a document prepared by staff at the Waterford and submitted to Medicare to support payment requests. Sections of the MDS are automatically populated from a patient's Electronic Medical Record on the Waterford's Optimus system. The MDS Coordinator and others, however, can alter these sections prior to the submission to the MDS in order to fraudulently justify a higher RUG rate. For example, Section J of the MDS contains information on a patient's pain and can be sued to justify a higher RUG rate. If a patient requires more pain control, then their case is more complex justifying a higher RUG rate. Staff can then artificially reduce the patient's pain with increased doses of pain medication to facilitate

completion of a higher number of therapy minutes. Section K is completed by the dietitian, and certain reports can trigger a need for speech therapy supporting a higher RUG rate.

96.     When MDS reports are backdated, the government is harmed. The reason for backdating MDS reports is that whenever a facility misses the required deadlines for reports on patients, they become ineligible for any but the lowest payment level, $185 per day. Backdating makes it appear that the reports were opened and completed on time making the facility eligible to receive any level of payments deemed proper based on this fraudulent record.

97.     Relator Mangrum remembers a conversation between her, Karen Burch, and Aimee Whitehouse in which Relator Mangrum insisted that she would not partake in the backdating of MDS Reports. Karen Burch stated that they would not be in compliance if they did not backdate the MDS reports.

98.     Once Relator Mangrum mentioned her concerns about backdating, Aimee Whitehouse brought a sheet of paper to Relator Mangrum indicating an instance of backdating from 2012. Aimee Whitehouse stated that she 'didn't know what it was.' Furthermore, Relator Mangrum relayed a conversation in which Lifespace's Charles Hall, its corporate national Director of Clinical Excellence, told her directly that, "Sarah and I have gone back 10 years and found backdating, but it wasn't that bad and if it got out it would come out in our favor." This indicates that the backdating practice has been in place for at least 10 years prior to Relator Mangrum's employment at the Waterford.

99.     In late 2014 Defendant Polaris audited the Waterford's MDS forms since 2009 and issued a report in November 2014.  In its report, Polaris concludes that the backdating began in 2010 and also notes that the current Director of Nursing, Relator here, refused to adhere to the backdating practice and instead "would require accurate dates and 'locking of the MDS

assessment when it was signed as completed.'" Since Relator was excluded from the process, the backdating continued and resulted, according the Polaris' report, in annualized overpayments from Government Programs of nearly $800,000 for the years 2009 through late 2014.

100.    Relator Mangrum observed that the Waterford would never submit a late MDS and take the default rate, but would always back-date the form to ensure maximum payment. When Relator Mangrum brought her concerns to employees at Lifespace's corporate offices an investigation was launched into Medicare billing practices at the Waterford. Corporate officers and lawyers traveled to the Waterford to complete the investigation at the end of October 2014.

101.    Following this investigation, Karen Burch signed a letter stating that she did all of the backdating herself with no encouragement or assistance from anyone else at Lifespace. This account is unlikely as the practice is widespread at other Lifespace facilities.

102.    When Karen Burch was terminated from the Waterford, Relator Mangrum witnessed Aimee Whitehouse removing boxes of MDS confirmation page copies from Karen Burch's office and shredding the documents.

103.    One portion of the MDS report that has not been completed correctly at the Waterford is the physician certification. This certification is meant to be signed by the physician in charge of patient care in order to verify the level of nursing care that the patient requires. In practice at the Waterford, however, the MDS Coordinator simply requests signatures from the doctors with little explanation and no chance to review the materials. The doctors at the Waterford trust the other employees and thus do not feel a need to carefully review every document that they sign. Dr. Mistry, Medical Director at the Waterford, commonly signs these physician certifications without proper knowledge of patient care.

104.   Before an MDS report is submitted, the MDS Coordinator is tasked with verifying the information that is self-populated into the MDS from nursing documentation. The MDS Coordinator is supposed to check with multiple sources including nursing staff, therapists, and social workers in order to determine if the information included in the report is true. In practice, however, the MDS Coordinator at the Waterford, Karen Burch, did not properly verify the MDS reports and was known to sometimes enter information into the MDS herself, an improper practice. The only staff allowed to enter information into the MDS report are the Director of Nursing, therapists, social workers, and other similar staff.

105.   An RN must close the MDS Report, and when the MDS Coordinator is not an RN, the Director of Nursing is generally in charge of closing these reports. Additionally, Skilled Nursing Facilities are supposed to allow the Director of Nursing to review MDS reports before they are submitted to Medicare. Relator Mangrum, current Director of Nursing at the Waterford, has not been asked to review MDS Reports since refusing to backdate the reports. The MDS Coordinator at the Waterford often had one of the charge nurses, Ruth Anne, sign off on the MDS reports. Ruth Anne was chosen to sign off on the backdated reports because she didn't know what they were and was unlikely to review or question any inconsistencies within the reports.

106.   Lifespace hired a consulting firm, Polaris Group, which was on retainer, to provide revenue enhancement advice, help to audit charts, and MDS reports, and to supposedly identify improper billing practices. A Polaris employee, "Sarah," had been providing this auditing service to the Waterford for at least 4 years prior to the investigation into back-dating allegations described in the Complaint. Even after Karen Burch, former MDS coordinator, was terminated from the Waterford, however, "Sarah" maintained her consulting position with

Lifespace. At all times material hereto, Polaris knew that The Waterford was receiving improper overpayments from Government Programs.

107.    Relator Mangrum stated that staff has been known to tell patients that Medicare won't cover their expenses if they don't complete their assigned therapy minutes. These statements were made in an attempt to force patients to complete these unnecessary therapy minutes thus maintaining their eligibility for a higher RUG rate and related payments.

108.    Lifespace's unlawful conduct also adversely impacted the skilled therapy that non-Medicare or non-MEDICAID patients received.  Specifically, these patients were given a lower priority because they were deemed to provide less of a financial windfall than Defendants were able to recover through reimbursements received from Government Programs.

109.    Relator Mangrum stated that she has observed employees at the Waterford purposely delaying the completion of change of status/therapy documentation until someone else on the staff points out a need for a change.

110.    In addition to these issues related to back-dating and altering patient reports, patient charts regularly lacked the necessary nursing documentation to support therapy decisions. Nursing notes and observations would disagree with therapy decisions made, suggesting improper patient RUG assignments were made. Nursing documentation would indicate that a patient did not require nursing care, meaning that the patient should have been discharged to continue therapy at home or on an outpatient basis to decrease costs billed to Medicare.

111.    For example, Patient A was alert and oriented with no cognitive issues and was capable of going to the bathroom independently, and yet on her MDS report submitted to Medicare she was classified as having 'total dependence.' Nurses notes did not support her

assigned therapy and complexity of care level indicating an improper patient RUG assignment and improper billing of Medicare.

112.    Lifespace held a weeklong conference from May 10-15, 2015 for all of their Directors of Nursing, a total of 12 Directors of Nursing. The new CEO at Lifespace, Sloan Bentley, was present at the conference for at least one day. Other attendees included the 12 Directors of Nursing representing each of Lifespace's facilities, various administrators, and several corporate officers flown in from Iowa. Around 40 total people attended the conference, based on an estimate by Relator Mangrum. The conference covered all services offered by Lifespace including rehabilitation, assisted living, and independent living. Sheila Mangrum noted that the relatively new CEO at Lifespace (Sloan Bentley) is extremely profit-driven, a characteristic emphasized in her corporate strategies. She has added 20 employees to the corporate office in the last six months.

113.    Charles Hall praised The Waterford at this meeting for its high level of RUG classifications at the "RUB" level, without any indication that he was concerned about the high rate being the result of fraudulent practices. Relator Mangrum found this high RUB rate concerning since The Waterford generally accepts less medically complex patients, so their numbers likely shouldn't be higher than the state average. All of Lifespace's facilities had higher than average levels of patients with RUG classifications at the "RU" and "RUB" levels when compared with state numbers.

114.    While in attendance at an Awards Dinner for the attendees of the Lifespace Directors of Nursing conference in Del Ray, Relator Mangrum heard CEO Sloan Bentley state that she 'would be willing to sacrifice a star to make an extra million dollars', referencing the system by which skilled nursing facilities are rated for quality of care provided.

115.    In relation to the 5-star rating for the Waterford facility, management was improperly moving employee work hours to qualify for the rating. A 5-star rating requires that an RN be present on the floor at all times. Management was counting the Director of Nursing's hours as time for an 'RN on the floor' which the Director of Nursing is not as she does not provide direct patient care.

116.    In order to maintain their status as a non-profit organization, Lifespace runs Deerfield, a non-profit facility to which Lifespace makes donations and loans on a regular basis. They use these donations to a facility that they own and control to justify their status as a non-profit organization for tax purposes. The facility was previously run by Lifespace as part of their regular business practices, but has since been removed from beneath their umbrella.

117.    Defendants intentionally submitted false claims to Government Programs by altering and/or backdating MDS reports and using false statements and/or records to support their false claims.

118.    Defendants knew that false claims were being submitted in connection with MDS records manipulation. As a direct result of Relator's complaints, Lifespace undertook an "MDS Audit Review Project, and in November 2014 issued a report. The audit consisted of a sampling of MDSs for the previous nine months (although Lifespace already knew about its MDS problems, but failed to stop MDS manipulation like backdating since such acknowledgment would result in the return of millions of dollars in improper Medicare payments). The report validates Relator's complaints, and quantifies the overpayment amounts for just the sample MDSs. For 2014, the total improper payments to The Waterford is calculated to be $782,742.10.

119.    Lifespace knew that The Waterford's MDS manipulation resulting in substantially higher Medicare payments was a problem dating back at least six years, and that similar MDS problems resulting in improper payments were occurring in other Lifespace SNFs.

120.    Thus, for at least the last six years, in connection with falsified MDS records, fraudulently billing for Ultra High RUG rates, Defendant Lifespace has submitted, caused to be submitted, or created false records to unlawfully obtain millions of dollars from Medicare and Medicaid, with the knowledge and complicity of the other Defendants.

## VI.    DEFENDANTS CONSPIRED TO DEFRAUD GOVERNMENT PROGRAMS

121.    As alleged in this Complaint, another one of the key facets of Lifespace's scheme involved one or more plans to further the overall fraud through a pattern and practice of false and misleading claims for therapy services ("overt acts").

122.    Defendants entered into numerous agreements through which they agreed to conspire to perform the overt acts alleged herein.  The overt acts included the submission to Government Programs by Defendants' skilled nursing facilities of knowingly false certifications that are conditions of Government Program participation and payment (which certifications were false at the time the certifications were made).  As a result of these false certifications, Government Programs made payments to Defendants' skilled nursing facilities.

123.    Defendants agreed and intended to perform and to benefit from these unlawful overt acts in furtherance of the scheme to target and financially injure Government Programs by submitting or causing the submission of false or fraudulent claims and records.

124.    As described in this Complaint, Defendants intentionally conspired to get a false or fraudulent claim allowed or paid by the United States; one or more of these conspirators performed one or more overt acts to effect the object of the conspiracy; and Government Programs suffered damages as a result of the false or fraudulent claims.

## VII.   DEFENDANTS KNOWINGLY VIOLATED THE FALSE CLAIMS ACT AND FALSELY CERTIFIED COMPLIANCE WITH FEDERAL REGULATIONS

125.    Defendants' schemes, as described herein, subject Defendants to liability under the False Claims Act, 31 U.S.C. § 3729 as a direct result of the false claims submitted to Government Programs for services that were ineligible for reimbursement.

126.    Defendants' unlawful conduct was material to reimbursement decisions made by Government Programs.

127.    Defendants are responsible for evaluating relevant Medicare regulations.

128.    In order to enroll in and bill Medicare, providers like Defendants must sign CMS Form 855, which states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. … I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

129.    As a result of the foregoing, every claim for payment submitted to Government Programs constituted a representation that the provider(s) had complied with all laws, regulations, and program instructions material to the claim, and that the provider was entitled to payment in full.

130.    The CMS application also contains an acknowledgement that Defendants were providing true, correct, and complete information to Medicare.

131.    Defendants did not notify CMS that it was engaged in unlawful upcoding and other illegal practices after it began billing Medicare for services provided to Medicare beneficiaries.

132.    Defendants have continued to bill Government Programs, including Medicare, and MEDICAID, for services rendered to program beneficiaries from at least 2009 to the present.

133.    Claims that were submitted to Government Programs as a result, in part or in whole, of Defendants' misrepresentations regarding its compliance with the agreement it entered into with CMS were therefore false within the meaning of the federal False Claims Act.

134.    Government Programs paid reimbursements for those false claims, and as a result have incurred and continue to incur significant damages due to Defendants' illegal conduct.

135.    By causing these claims that it knew were ineligible for reimbursement to be submitted to and paid for by Government Programs, Defendants also made, used, or caused to be made or used, false records or statements material to false or fraudulent claim.

136.    In connection with Defendants' unlawful scheme, Government Programs relied on false and fraudulent statements when they approved payment for skilled therapy services, and in the absence of these false and fraudulent statements, they would not have approved such payments.

137.    Defendants engaged in this conduct knowingly and with the intent to cause the submission of false claims to Government Programs.

138.    Government-funded health plans paid reimbursements for the resulting false claims, and as a result have incurred and continue to incur significant damages due to Defendants' fraudulent scheme.

139.    By causing these claims that it knew were ineligible for reimbursement to be submitted to and paid for by Government Programs, Defendants also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.

140.    Accordingly, Defendants have, expressly and impliedly, falsely certified its compliance with these federal and state statutes and regulations.

141.    Defendants' certifications of compliance with applicable statutes and regulations were material to Government Programs' decisions to make reimbursements for Defendants' skilled therapy services.  Had Government Programs known that Defendants' certifications of compliance with the law were false, they would not have made reimbursements for these services.

142.    Defendants' false certifications of compliance with the law constituted the making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, and they directly caused Government Programs to pay or reimburse for skilled therapy services that were not eligible for payment or reimbursement.

143.    Defendants knew that its certifications of compliance with the law were false, and that its false certifications would cause Government Programs to make payments for its services.

## VIII.   DEFENDANTS UNLAWFULLY RETALIATED AGAINST RELATOR

144.    Relator opposed Defendants' illegal practices.  Relator voiced her views to superiors on multiple occasions throughout Relator's employment.

145.    Relator was engaged in conduct protected by 31 U.S.C. § 3730(h), because she complained again and again to Defendants, including Charles Hall from corporate, about the unlawful actions of the Defendants, asked Defendants to get in compliance and stop their unlawful policies, and told them since they were not in compliance with government regulations, that Relator was worried about being associated with Defendants' unlawful and reckless behavior, since she and Defendants could get in trouble with the law, and she was just trying to warn Defendants.

146.    As a direct result of Relator's efforts to halt Lifespace's illegal billing conduct, Relator has experienced retaliation, intimidation and harassment.  For example, in 2015, Relator was denied the standard bonus given to the other Lifespace SNF Directors of Nursing, which was verbally promised to her when she was hired.  Subsequently, when Relator has asked about the promised bonus, and timing, she was informed by management that it has not been decided on yet, but it will be made available shortly.  In conversations with other department heads, other employees have been given bonuses, or bonus structures have been given to them.  However, Relator continues to be deferred.

147.    Other acts of retaliation include:  a) being forced to go through "servant leadership" meetings, while the other department heads are excluded; b) relator's parking spot has been taken away, and there are times Relator cannot park anywhere near the facility; c) relator is singled out and scolded constantly about staffing, budgets, reports, complaints from outside residents (that Relator has nothing to do with); and d) excluded from some department head meetings, and then held accountable for the information relayed in those meetings.

148.    Even when a new Administrator was hired in 2015, acts of retaliation did not ease, but instead continued – and Lifespace has placed additional pressure on Relator to keep quiet. When Relator notified management of unsafe staffing practices on the night shift, she was told that "there's no easy answer" by the Human Resource Officer. When Relator pushed the issue because of concerns over her own nursing license, she was told by the new Administrator "don't start," meaning keep quiet. Keeping quiet also pertained to Relator raising an issue with the fire doors and alarms for elopement risk patients, that they do not work, and at times Relator is told to put chairs in front of these doors with yellow tape.

149.     Lifespace corporate management discouraged email complaints or criticism, and Relator has been told by corporate management to also keep quiet about the MDS backdating and other compliance issues, that Relator's best interest was "just best to keep out of it."

150.     Relator's reporting of the illegal conduct was both lawful and a protected activity under the anti-retaliatory provisions of the False Claims Act.

151.     Defendants knew that Relator engaged in the protected activity.

152.     However, none of Relator's complaints changed Defendants' unlawful policies or practices.

153.     As a direct result of Relator's lawful acts in furtherance of protected activities investigating and reporting fraud, Defendants retaliated against Relator.

**COUNT I**
**(Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A):**
**Presenting or Causing to be Presented False Claims)**

154.     Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

155.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

156.     As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT II
## (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B):  False Records or Statements)

157.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

158.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

159.    The United States, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing claims for services to patients enrolled in Federal Programs where said services are unnecessary, unreasonable and/or not provided.

160.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT III
## (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G): Reverse False Claim)

161.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

162.    Defendants, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government pursuant to 31 U.S.C. § 3729(a)(1)(G).

Filed Under Seal

163.   As a result of Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C): Conspiracy)

164.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

165.   The Defendants conspired with numerous entities to commit the acts which constitute violations of 31 U.S.C. §§ 3729(a)(1) (A) & (B) & (G).

166.   As a result of Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT V
### (Violation of False Claims Act, 31 U.S.C. § 3729(h):  Unlawful Termination)

167.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

168.   Relator's reporting of unlawful conduct resulted in retaliation for protected acts taken by Relator to report violations of the False Claims Act and in retaliation for other lawful acts taken by Relator in furtherance of an action under the False Claims Act.

169.   Defendants' retaliatory acts have proximately caused Relator to suffer and to continue to suffer substantial damage, in an amount to be proven at trial.

## COUNT VI
### (Violation of Florida False Claims Act)

170.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

171.   This is a civil action brought by Relator, on behalf of the State of Florida, against Defendant under the Florida False Claims Act, Fla. Stat. § 68.083(2).

172.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

173.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

174.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

175.   The Defendants conspired with numerous entities to commit acts in violation of the Florida False Claims Act, in violation of Fl. Stat. §68.082(2)(c).

176.   The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

177.   As a result of Defendant's actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## COUNT VII
## (Violation of Iowa False Claims Act)

178.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

179.    This is a civil action brought by Relator, on behalf of the State of Iowa, against Defendant under the Iowa False Claims Act, Iowa Code § 685.3(2)(a).

180.    Defendant, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

181.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

182.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Iowa, or its political subdivisions, in violation of Iowa Code § 685.2(1)(g).

183.    The Defendants conspired with numerous entities to commit acts in violation of the Iowa False Claims Act, in violation of Iowa Code § 685.2(1)(c).

184.    The State of Iowa, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims

Filed Under Seal

and/or statements, paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

185.    As a result of Defendant's actions, as set forth above, the State of Iowa and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII
### (Violation of Illinois False Claims Act)

186.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

187.    This is a civil action brought by Relator, on behalf of the State of Illinois, against Defendant under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/4(b).

188.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

189.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

190.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, or knowingly conceals or

knowingly and improperly avoids or decreases an obligation to pay or transmit money to the state of Illinois and/or its political subdivisions, all in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

191.    The Defendants conspired with numerous entities to commit acts in violation of the Illinois False Claims Act, in violation of 740 ILCS § 175/3(a)(1)(C).

192.    The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

193.    As a result of Defendant's actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT IX
### (Violation of Minnesota False Claims Act)

194.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

195.    This is a civil action brought by Relator, on behalf of the State of Minnesota, against Defendant under the Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

196.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

197.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claim paid or approved by the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

198.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, or its political subdivisions, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the State of Minnesota and/or its political subdivisions, all in violation of Minn. Stat. § 15C.02(a)(7).

199.    The Defendants conspired with numerous entities to commit acts in violation of the Minnesota False Claims Act, in violation of Minn. Stat. § 15C.02(a)(3).

200.    The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state and state subdivision funded health insurance programs.

201.    As a result of Defendant's actions, as set forth above, the State of Minnesota and/or its political subdivisions have been, and may continue to be, severely damaged.

**WHEREFORE**, Relator prays for judgment against Defendants as follows:

A.      That Defendants be ordered to cease and desist from submitting or causing to be submitted any more false claims, or further violating 31 U.S.C. § 3729 *et seq*.;

B.     That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus applicable civil penalties, of not less than five thousand five hundred dollars ($5,500) and more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

C.     That judgment be entered in favor of Relator, on behalf of the state of FLORIDA and/or its political subdivisions, and against Defendants in the amount of the damages sustained by the state of Florida and/or its political subdivisions, multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each violation of the Florida False Claims Act as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the state of Florida and/or its political subdivisions for losses resulting from the various misconduct undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

D.     That judgment be entered in favor of Relator, on behalf of the state of IOWA and/or its political subdivisions, against Defendants in the amount of damages sustained by the state of Iowa and/or its political subdivisions, multiplied as provided for in Iowa Code § 685.2(1), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) for each violation of the Iowa False Claims Act, as provided by Iowa Code § 685.2(1), to the extent such multiplied penalties shall fairly compensate the state of Iowa and/or its political subdivisions for losses resulting from the various misconduct undertaken

by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      E.    That judgment be entered in favor of Relator, on behalf of the state of ILLINOIS and/or its political subdivisions, and against Defendants in the amount of the damages sustained by the state of Illinois and/or its political subdivisions, multiplied as provided for in 740 ILCS § 175/3, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Illinois False Claims Act, as provided by 740 ILCS § 175/3, to the extent such multiplied penalties shall fairly compensate the state of Illinois and/or its political subdivisions for losses resulting from the various misconduct undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      F.    That judgment be entered in favor of Relator, on behalf of the state of MINNESOTA and/or its political subdivisions, and against Defendants in the amount of the damages sustained by the state of Minnesota and/or its political subdivisions, multiplied as provided for in Minn. Stat. § 15C.02(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Minnesota False Claims Act, as provided by Minn. Stat. § 15C.02(a), to the extent such multiplied penalties shall fairly compensate the state of Minnesota and/or its political subdivisions for losses resulting from the various misconduct undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      G.    That Defendant be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

H.      That judgment be granted for Relator against Defendant for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

I.      That Relator be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relator demands a trial by jury of all issues so triable.

Dated:  June 9, 2016

Jonathan Kroner
Jonathan Kroner Law Office
420 Lincoln Rd, Suite 248
Miami Beach FL 33139
Telephone:  305-310-6046

Thomas J. Poulin (D.C. Bar No. 475115)
Gerald C. Robinson (D.C. Bar No. 437079)
SIMMER LAW GROUP PLLC
600 New Hampshire Avenue, NW, Suite 10-A
Washington, DC 20037
Telephone:  202-333-4562

David Krangle
Alonso Krangle LLP
445 Broad Hollow Road
Suite 205
Melville, New York 11747
Telephone: 516-350-5555

*Attorneys for Plaintiff/Relator*

## CERTIFICATE OF SERVICE

This document will **not** be served on Defendants.


I HEREBY CERTIFY that the foregoing has been mailed, postage prepaid, certified mail, this _____ day of _____, 2016, to The Honorable Loretta E. Lynch, Attorney General, United States Department of Justice, c/o Sealed Document Civil Process Clerk, 10th and Constitution, Washington, D.C. 20530; and

The Honorable United States Attorney Wifredo A. Ferrer, 99 N.E. 4th Street, Miami, FL 33132


/s/ Jonathan Kroner